UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SUSAN MORRIS-HUSE,

    Plaintiff,

v.                                                    Case No: 8:16-cv-1353-T-36AEP

GEICO,

    Defendant.
_____/

## **ORDER**

This cause comes before the Court on Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 32), Plaintiff's Memorandum in Opposition to the Defendant's Motion for Summary Judgment (Doc. 38), and Defendant's Reply Brief in Support of Its Motion for Summary Judgment (Doc. 42). Plaintiff filed a Complaint (Doc. 1) alleging that she is an employee of Defendant, which discriminated against her by failing to accommodate her disability in violation of the Americans with Disabilities Act ("ADA"). Defendant moved for summary judgment on Plaintiff's claim. Doc. 32. Upon due consideration of the parties' submissions, including depositions, declarations, and exhibits, and for the reasons that follow, the Court will grant GEICO's motion for summary judgment.

**I.    BACKGROUND AND FACTS**

Morris-Huse has been employed by GEICO since 1992. Morris-Huse Depo. 51:6-7. She worked in the Woodbury, New York office from 1992 to November 2014, when she transferred to GEICO's Lakeland, Florida office. Mahler Decl. ¶ 6. She remains employed by GEICO, but has not worked since June 15, 2015. Morris-Huse Depo. 32:8-11; Mahler Decl. ¶ 7. She is currently on long term disability, and her date of disability was determined to be May 1, 2015. Morris-Huse

Depo. 13:1-13, Ex. 1. Morris-Huse has held the position of TCR 1 Supervisor since 2007. Mahler Decl. ¶ 7.

GEICO has a written job description for TCR I Supervisor, dated November 2012. Morris-Huse Depo. Ex. 9. The primary position objective, according to GEICO, is "[u]nder general supervision, SUPERVISES the processing and settling of claims in a Telephone Claims Unit." *Id.* It lists the essential functions as:

1. INTERVIEWS and/or APPROVES job applicants for employment. CONDUCTS and/or REVIEWS associate performance appraisals. INITIATES or APPROVES salary adjustments, performance ratings, and other personnel changes. COUNSELS associates and TAKES disciplinary action or TERMINATES the employment of associates as appropriate.

2. DIRECTS technical and clerical personnel in the settlement, investigation and processing of property and casualty claims. AUTHORIZES payments within personal authority, when they exceed CSR II and TCR I authorization.

3. SUPERVISES the activities of the Telephone Claims Representative I.

4. TRAINS and/or COORDINATES the training of associates, REVISES training materials as necessary.

5. ASSISTS in preparation of plans and budgets.

6. PREPARES reports on work volume, T.I.P. or work quality.

7. ADHERES to the GEICO Code of Conduct, the GEICO Claims Code of Conduct, company policies and operating principles.

8. MEETS attendance standard of the business location, to perform necessary job functions and to facilitate interaction with subordinates and management.

As requirements, GEICO included being able to perform the essential functions of the job, including "performing duties in a stationary position at a workstation, seeing, hearing, typing, bending, reaching, lifting, carrying and speaking." *Id.* Morris-Huse agreed that this accurately described the essential functions of the job, except that she did not agree that interviewing and/or

2

approving job applicants, or assisting in preparation of plans and budgets constituted essential functions. *Id.* 56:8-55:2.

Morris-Huse was diagnosed with Meniere's Disease around 2003 or 2004. *Id.* 77:2-3. Meniere's Disease caused Morris-Huse to suffer from random attacks of vertigo, and nearly chonic bouts of dizziness and imbalance. Morris-Huse Depo. Ex. 10. Morris-Huse took disability leave intermittently after her diagnosis to attend doctor's appointments and because of symptoms of the disease. *Id.* 77:9-78:3. In July 2013, Morris-Huse went on open-ended medical leave to have a procedure for her condition. *Id.* 78:10-17, 79:25-80:5. She and her doctor, David Schessel, began communicating with GEICO regarding her return to work in October 2013. *Id.* Ex. 10, 11; Mahler Decl. ¶ 8. Ultimately, Morris-Huse returned to work as a TCR 1 Supervisor, a position she had held since 2007. Mahler Decl. ¶ 7.

On October 10, 2013, Schessel, wrote to GEICO regarding Morris-Huse's employment. Morris-Huse Depo. Ex. 10. He wrote that the "disorder produce[d] random attacks of vertigo and in her case, nearly chronic bouts of dizziness and imbalance." *Id.* He stated that although Morris-Huse was "able to work a full day, she [wa]s unable to reliably drive long distances and do things that require[d] walking up and down stairs." *Id.* Because of this, Schessel "recommended that [Morris-Huse] be allowed to work from home with a reduced need to drive to work on a daily basis." *Id.* Schessel also completed a Health Care Provider Certification for Job Adjustment Request, which also stated that Morris-Huse suffered from Meniere's Disease, which caused random attacks of incapacitating vertigo. *Id.* Ex. 12. He wrote that Morris-Huse was able to work a full schedule, but driving to work or taking stairs was problematic. *Id.* He stated that an accommodation that limited her need to drive to work would enable her to perform the essential functions of her job, and recommended that performing most work from home would be best. *Id.*

3

GEICO concluded that the medical documents provided by Morris-Huse and her doctor did not establish that Morris-Huse was unable to work in the office, but instead required an accommodation that eliminated the need to travel long distances to and from work. Mahler Decl. ¶ 8. GEICO suggested that Morris-Huse utilize mass transit to travel to and from the office to accommodate her driving limitations. *Id.* ¶ 10. GEICO also investigated use of the Suffolk County Accessible Transportation, which was determined not to be an option. *Id.* Additionally, GEICO set up a ride-share program by asking associates located in the same vicinity as Morris-Huse whether they could transport her to and from work. *Id.* ¶ 11. Various employees in the Woodbury office were able to do so. *Id.* To accommodate the need to avoid stairs, GEICO was advised that she could use the elevator. *Id.* ¶ 12. GEICO also informed Morris-Huse that should she experience symptoms during work, she could use her supervisor's office, a conference room, a utility room, or the ladies room lounge while the symptoms were ongoing. *Id.* ¶ 13.

Morris-Huse determined that public transportation was not a viable option, although she could not recall if she ever provided medical documentation to support this conclusion. Morris-Huse Depo. 150:18-19. She testified during her deposition that the movements of the train and visual stimulation from the window made riding a train difficult. *Id.* 150:21-22. Additionally, she would be required to use three to four forms of transportation to get from her house to the train station, and from the train station to the office. *Id.* 151:18-25. Morris-Huse never tried taking the train. *Id.* 216:13-16.

Despite being unsure of whether she could perform her job duties remotely, Morris-Huse requested as an accommodation to be able to telecommute, at least on a trial basis, or be assigned to another position within GEICO. For example, on October 24, 2013, Morris-Huse wrote to GEICO that she was "not asking for an accommodation to continue working as a supervisor in the

TA1 department" because "[i]t [wa]s obvious based on [her] limitations that it [wa]s not possible." Morris-Huse Depo. Ex. 11. Specifically, Morris-Huse wrote that "[b]ased on [her] mobility limitations [she] inquired if that [wa]s another position available for [her]." *Id.* She additionally indicated that she sought a position for which she could telecommute. *Id.* Similarly, within the same e-mail conversation, Morris-Huse had earlier indicated that although she was "capable of working and . . . anxious to return to work, [her] inability to drive long distances, and [her] balance and intermittent vertigo ma[d]e a commitment to being in the office difficult." *Id.* Thus, she inquired whether "there were any positions open that would possibly be more suited for [her] due to [her] disability." *Id.* During her 2017 deposition, Morris-Huse no longer agreed with her October 24, 2013 assessment that she would not be able to continue working as a supervisor. *Id.* 86:9-13.

Similarly, on November 8, 2013, Morris-Huse wrote to GEICO's Leave Administrator, Jennifer Einbinder, that she was unable to drive, and commuting to the Woodbury office on a daily basis was problematic. *Id.* Ex. 13. She stated that the symptoms of Meniere's disease were often optically stimulated, including by things such as flickering fluorescent lights, computer screens, and patterned carpeting. *Id.* Because of these issues, she requested an accommodation under the ADA, specifically, to be permitted to telework. *Id.* She recognized, however, "that performing [her] job while not physically in the building [wa]s questionable even with significant accommodation," but that it might be possible "on a temporary basis." *Id.* She further advised that she "could make travel arrangements to be in the office for a few days a week on a flexible basis." *Id.* In the event that such accommodations would result in undue hardship, Morris-Huse requested to be reassigned to another position that could be performed via telecommuting. *Id.* She suggested CU examiner, or claims file auditor. *Id.*

5

Thereafter, on November 18, 2013, Morris-Huse e-mailed GEICO explaining that Meniere's Disease is an inner ear problem that causes bouts of vertigo, balance instability, and hearing loss. *Id.* Ex. 15. She explained that despite taking medication for the disease and other attempts to minimize symptoms, she had not gone more than a few days without vertigo. *Id.* She again explained her mobility issues, and that the office environment could stimulate vertigo. *Id.* She also stated that public transportation was not an option because she had previously experienced a vertigo attack in public and it was terrifying and dangerous. *Id.* Because of these limitations, Morris-Huse again requested that she receive an accommodation in the form of telework with a flexible option of going into the office as needed. *Id.* She stated that she realized such an arrangement was "not ideal," but hoped that GEICO would be willing to try it. *Id.* During her 2017 deposition, Morris-Huse no longer agreed with her November 2013 assessment. *Id.* 100:9-10.

On January 28, 2014, GEICO, through Janet Burleson, wrote Morris-Huse a letter stating that she could return to work as a TCR1 Supervisor on February 3, 2014. Doc. 38-1 at 9. The letter stated that "[a]s previously discussed . . . you need to be present Monday through Friday to supervise your staff." *Id.* The letter referred to Schessel's assessment that Morris-Huse could not reliably drive long distances or use stairs, but explained that GEICO consulted with Schessel's assistant, who advised GEICO "that the use of elevators and public transportation would be acceptable."[1] *Id.* Additionally, the following day, Burleson advised Morris-Huse that GEICO could not offer a flexible work schedule. *Id.* at 10. She further stated that should Morris-Huse require a quiet and private space for a few minutes or during breaks and lunch, she could use a

---

[1] Morris-Huse disputes that this information was communicated by her physician's office. Morris-Huse Depo. 159:15-22.

medical unit when available or an empty office. *Id.* She informed Morris-Huse that after she returned to work, GIECO would "be better able to determine the appropriate accommodations." *Id.*

In response, Morris-Huse requested as an accommodation that she be permitted to arrive late and work late on days she felt balance issues, or, alternatively, be permitted to take vacation time or leave without pay on such instances. *Id.* Because Morris-Huse's belief was that "most of the TCR sections have a few examiners with varying schedules," she thought that such an accommodation would not impact others. *Id.* Additionally, Morris-Huse stated that she required a set location where she could safely weather vertigo episodes so that she would not be required to locate a location at the onset of an episode. *Id.*

Burleson responded that GEICO did "not have any medical documentation" to support Morris-Huse's request for "a change in schedule," but that they could discuss Morris-Huse's concerns after she returned to work. *Id.* at 11. Regarding a location where Morris-Huse could go during vertigo episodes, Burleson stated that she could use the lounge chair in the restroom nearest Morris-Huse, or the medical unit "when open." *Id.*

Morris-Huse ultimately returned to work using the ride-sharing option. Mahler Decl. ¶ 15. She traveled to and from work via ride-sharing for approximately nine months. *Id.* During her deposition, Morris-Huse testified that the ride-share program was not a reliable solution, because drivers occasionally had after-work commitments and could not take her home, or did not show up on a day the driver was supposed to drive her. Morris-Huse Depo. 144:19-145:15. She did locate a reliable driver, which was aided by being provided flexibility in her schedule. *Id.* 145:23-146:17. Morris-Huse found ride-sharing with this individual to be an acceptable option for getting to and from work. *Id.* 145:23-25. However, by April 22, 2014, Morris-Huse had missed at least

7

47 hours of work in connection with her illness. Doc. 38-1 at 29. The reasons included attending a workers compensation hearing and not being able to obtain a ride to work afterward, feeling unwell because of her condition, being unable to travel due to dizziness, leaving work early because her ride-share left early, and attending a doctor's appointment and being unable to obtain a ride afterward. *Id.*

On at least four occasions, Morris-Huse advised GEICO regarding difficulties with the ride-share system. On March 17, 2014, Morris-Huse e-mailed Margaret Dollay, the Region 2 TCR1 manager, that the individual she intended to ride-share with was not working the following day, and the only other individual she could ride-share with worked different hours. *Id.* at 17. Morris-Huse asked whether she could work those hours for that day, and Dolley responded that human resources would not allow that. *Id.* Dolley recommended another individual who lived in the area, and asked whether Morris-Huse required the list of potential ride-share individuals from whom she could request a ride. *Id.* Morris-Huse responded that she had the list, and that the recommended individual would not be able to give her a ride. *Id.*

Subsequently, on July 17, 2014, Morris-Huse e-mailed several individuals at GEICO that she had reached out to a few of the individuals whose names were provided regarding the ride-share accommodation, but that no one was able to commit to driving her both to work and home. *Id.* at 20. She stated that it was not appropriate for her to contact those people who either directly or indirectly reported to her, because they previously advised HR that they would not drive Morris-Huse under the ride-share accommodation. *Id.* On this occasion, Morris-Huse informed GEICO that she would work from home because she had no other option and was able to perform her job duties remotely. *Id.* She stated that if that was not an acceptable option, she required an alternative arrangement. Similarly, on July 22, 2014 Morris-Huse sent an e-mail stating that she could not

obtain a ride and would work from home. *Id.* at 30. On October 17, 2014, Morris-Huse's ride-share driver called in sick, and Morris-Huse was unable to obtain another mode of transportation. *Id.* at 31.

Additionally, Morris-Huse expressed to GEICO that she had difficulties with the accommodation provided to her regarding a place to go in the event of a vertigo episode. For example, on May 13, 2014, when she attempted to use the nurse's office, she was advised that it was closed after the nurse retired. *Id.* at 19. Morris-Huse contacted another GEICO employee asking to use her office, but did not receive a response for hours. *Id.* This was one of two vertigo episodes that she experienced in the Woodbury office after returning to work. Morris-Huse Depo. 176:23-6. Both episodes lasted a few minutes. *Id.* 177:7-9. During the second episode, Morris-Huse remained in her cubicle and sat on the floor. *Id.* 177:12-13, 23-24.

Approximately a week after the first vertigo episode, Morris-Huse e-mailed GEICO, expressing concern that her disability was not being accommodated. Doc. 38-1 at 15-16. She stated that she required one set location where she could go in the event of an episode because she would be unable to determine whether one of several offered spaces were available at the time of an episode. *Id.* at 16. Additionally, she indicated that her co-worker's office was frequently occupied, the conference room was not close to her and also often occupied, the ARB room would be occupied for six months, and the ladies lounge was not a quiet and private area. *Id.* She again requested a flexible schedule that would allow her to work a full day, but permit her to start between one hour earlier or later than the standard schedule. *Id.*

In the same communication, Morris-Huse stated that the accommodations provided did not allow her to work a full week, which caused her to fall below GEICO's dependability requirement. *Id.* at 15. She advised that her belief was that GEICO's intent was to terminate her due to lack of

9

dependability. *Id.* She felt that GEICO had not engaged in an interactive process or any dialogue to assist her, but had instead denied her requests and suggestions and advised that the inability to travel would be held against her dependability. *Id.*

Morris-Huse contacted GEICO several times indicating that she had and was able to perform work from home. For example, on July 29, 2014, Morris-Huse e-mailed several GEICO employees concerning work performed at home that was not compensated, and indicated that she was able to work full time and complete everything from home. Doc. *Id.* at 30. Additionally, on August 21, 2014, Morris-Huse e-mailed various individuals at GEICO that she had been unable to be physically present in the office due to balance issues preventing her from travel. *Id.* at 28. She indicated that she nonetheless worked a full day via telework, despite the day being considered without pay. *Id.* She stated that this demonstrated that her ability to work was not impaired, and requested that GEICO find a reasonable accommodation for her. *Id.*

In September 2014, Morris-Huse transferred from the Woodbury, New York office, to the Lakeland, Florida office. Morris-Huse Depo. 183:2-5; Mahler Decl. ¶ 17. In Lakeland, Morris-Huse was able to find housing within four miles of the office, which prevented her from needing to drive long distances to and from work. Morris-Huse Depo. 183:10-15. Nonetheless, there were days when Morris-Huse did not feel that she could drive to the office either because of vertigo or balance instability. *Id.* 188-24-189:10. On days when she experienced vertigo, she took Family Medical Leave Act ("FMLA") leave without pay. *Id.* 189:8, 14. On days when she experienced balance instability, which she testified did not qualify for FMLA leave, she took unplanned leave without pay. *Id.* 189:8-12. GEICO never received medical documents showing that she would be unable to go into the office, but could work from home on days when she experienced balance instability. LoCascio Decl ¶ 9.

After moving to the Lakeland office, Morris-Huse continued to request to be permitted to telework on days she was unable to physically be in the office. *Id.* 187:22-24. This accommodation was not permitted. *Id.* 208:6-10. Additionally, the only other available positions at the Lakeland office for which Morris-Huse qualified could not be performed from home because they required travel that Morris-Huse could not undertake, or software that was available only at GEICO offices. Mahler Decl. ¶¶ 12-15. While working at the Lakeland office, Morris-Huse was advised that she was not allowed to perform work from home on days she took leave under the FMLA. Morris-Huse Depo. 197:23-198:6. She was, however, still required to complete her work. *Id.* at 203:2-6.

Morris-Huse's Meniere's Disease precluded her from working in June 2015, and the last day she attended work at GEICO was June 15, 2015. Morris-Huse Depo. 32:5-22. At the time, Morris-Huse was unable to perform the activities of daily living, such as grocery shopping or housekeeping. *Id.* 33:19-34:11; 37:24-38:45. During vertigo episodes, Morris-Huse would sit on the floor, and was unable to use a computer, talk on the phone, or review documents. *Id.* 39:22-24, 40:9-22. In October 2015, Morris-Huse's health care provider completed a Health Leave of Absence Certification of Health Care Provider stating that Morris-Huse suffered from Meniere's Disease with persistent vertigo causing inability to perform activities of daily living. *Id.* Ex. 3.

During the course of events, Morris-Huse determined that GEICO failed to engage in any dialogue with her with regards to her request for accommodation. *Id.* 215:17-22. Accordingly, she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 25, 2014. *Id.* 214:5-14; Ex. 19. She obtained a Notice of Right to Sue letter from the EEOC in February 2016. *Id.* Ex. 22. Shortly thereafter, she filed this suit alleging that GEICO failed to accommodate her disability in violation of the ADA. Doc. 1.

## II. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex,* 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

## III. DISCUSSION

Under the ADA, an employer is prohibited from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job

training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of prohibited discrimination, a plaintiff must show that he or she (1) is disabled; (2) was a "qualified individual" at the relevant time, meaning that he or she could perform the essential functions of the job in question with or without reasonable accommodations; and (3) was discriminated against because of his disability. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) (citing *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000)). "An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability-unless doing so would impose undue hardship on the employer." *Id.* (citations omitted). It is the plaintiff's burden to establish a prima facie case of discrimination. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007). If the plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate undue hardship. *Id.* at 1262.

GEICO argues that it is entitled to summary judgment because Morris-Huse has not established a prima facie case of discrimination. GEICO does not dispute that Morris-Huse is disabled. Instead, GEICO argues that there is no genuine dispute of fact that (1) it provided reasonable accommodations to Morris-Huse, and (2) Morris-Huse was not a qualified individual because she was unable to perform the essential functions of her job even with reasonable accommodation. Doc. 32 p. 12-25. Morris-Huse argues that the accommodations provided by GEICO were not sufficient and did not address the symptoms of her disease and that her request for part-time telework was a reasonable accommodation. Doc. 38 p. 5-9.

Essential functions are "the fundamental job duties of the employment position the [disabled employee] holds or desires" and do not include "marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). "Whether a function is essential is evaluated on a case-by-case basis,"

13

through examination of "a number of factors," including the employer's judgment regarding essential functions and any written descriptions prepared by the employer before advertising or interviewing for the position. *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005); 42 U.S.C. § 12111(8)

Reasonable accommodation is accommodation that enables the employee to perform the essential functions of the job, and failure to provide reasonable accommodation for a disability constitutes discrimination under the ADA unless it imposes undue hardship on the employer. *Id.* (citing *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a)). It is the plaintiff's burden to identify an accommodation and demonstrate that it would allow him or her to perform the job's essential functions. *Id.* (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997); *Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997)).

The ADA provides examples of reasonable accommodation, including "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). However, although "the ADA may require an employer to restructure a particular job by altering or eliminating some of its marginal functions, employers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists." *Lucas*, 257 F.3d at 1260 (citing *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000)). Additionally, qualified individuals are "not entitled to the accommodation of [their] choice," or "the maximum accommodation or every conceivable accommodation possible," but instead, "only a reasonable

accommodation." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) (quoting *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 948 (N.D. Ga. 1995)).

The accommodations provided by GEICO addressed the restrictions that Schessel stated were required to be accommodated to allow Morris-Huse to perform the essential functions of her job. The only restrictions were that Morris-Huse was unable to drive long distances to work, or do things that required walking up and down stairs. Miller-Huse Depo. Ex. 12. Although he recommended that this would best be accommodated by allowing Morris-Huse to work from home, he did not state that this was the only potential accommodation. *Id.* Indeed, he advised that Morris-Huse was capable of working a full day as long as she did not need to drive or use stairs. *Id.* Morris-Huse concedes that the restrictions identified by Schessel were addressed when she returned to work in 2014. *Id.* 158:22-159:4.

Morris-Huse ultimately concluded that the ride-share accommodation was an acceptable solution once an appropriate driver was found and she received flexibility in her work schedule. *Id.* 145:23-25. When she transferred to the Lakeland office, her housing was only four miles from the office, and she was not required to drive long distances. *Id.* 183:10-15. The brunt of her complaint appears to be that she would have preferred an accommodation that she work from home because she concluded that these alternatives did not accommodate the symptoms of her Meniere's Disease. This is not the standard imposed by the ADA. An employee is not entitled to an accommodation of his or her preference, nor is he or she entitled to an accommodation that is not supported by medical documentation. *Stewart*, 117 F.3d at 1286 (stating that the ADA does not require an employer to provide an employee with the accommodation of his or her choice); *Jackson v. Boise Cascade Corp.*, 941 F. Supp. 1122, 1128 (S.D. Ala. 1996) (finding that an employer was not required to give an accommodation where the plaintiff did not provide admissible medical

evidence or testimony to support his assertion that the proposed accommodation would reasonably accommodate his disability). Thus, the restriction that Morris-Huse could not travel long distances to work was accommodated by GEICO through ride-sharing and transfer to a location where Morris-Huse could obtain housing close to work, and these were reasonable accommodations that allowed Morris-Huse to perform the essential functions of her job.

Moreover, telecommuting was not a reasonable accommodation because Morris-Huse was required to work a regular schedule in the office in order to achieve the essential functions of her job. No bright-line test has been established for determining whether physical presence is an essential function of a job, or whether telecommuting is a reasonable accommodation. The Sixth Circuit has determined that as a general rule, "[r]egular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs, especially the interactive ones." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 762-63 (6th Cir. 2015). The Sixth Circuit noted that this was consistent with informal guidance by the Equal Employment Opportunity Commission ("EEOC") that "[a]n employer may refuse a telecommuting request when, among other things, the job requires 'face-to-face interaction and coordination of work with other employees,' 'in-person interaction with outside colleagues, clients, or customers,' and 'immediate access to documents or other information located only in the work place.'" *Id.* (quoting EEOC Fact Sheet, *Work At Home/Telework as a Reasonable Accommodation* (Oct. 27, 2005), http://www.eeoc.gov/facts/telework.html). The Sixth Circuit has, however, also noted that "[t]he *Ford* decision leaves open the possibility that regular attendance might not be an essential function of every job, but suggests that exceptions will be relatively rare." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 392 (6th Cir. 2017). Other courts have followed this general rule. *Credeur v. La. Through Office of Attorney Gen.*, 860 F.3d 785, 793 (5th Cir. 2017) (stating that

16

"there is a general consensus among courts . . . that regular work-site attendance is an essential function of most jobs," particularly those that are interactive or involve teamwork); *Mdamu v. Am. Traffic Sols. Inc.*, No. CV-15-00326-PHX-DLR, 2016 WL 3519616, at *6 (D. Az. June 28, 2016) ("It is a 'rather common-sense idea . . . that if one is not able to be at work, one cannot be a qualified individual.' ") (quoting *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012); *Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir. 1999)).

The United States Court of Appeals for the District of Columbia took an approach that was more friendly to telecommuting in *Solomon v. Vilsack*, 763 F.3d 1, 10 (D.C. Cir. 2014). There, the Court ruled that "[d]etermining whether a particular type of accommodation is reasonable is commonly a contextual and fact-specific inquiry," and noted that "[t]echnological advances and the evolving nature of the workplace . . . have contributed to the facilitative options available to employers (although their reasonableness in any given case must still be proven.)" *Id.* The Court rejected the argument "that the 'ability to work a regular and predictable schedule' [wa]s, 'as a matter of law, an essential element of any job." *Id.* Instead, the Court determined that a penetrating factual analysis was required to determine whether physical presence was an essential function of a particular job. *Id.* Other courts have similarly engaged in a fact-specific analysis, while recognizing that physical presence has often been required because a job requires teamwork, face-to-face interaction, or use of equipment only available on site. *Fischer v. Pepper Hamilton LLP*, No. 15-02413, 2016 WL 362507, at *10-12 (E.D. Pa. Jan. 29, 2016) (stating that cases holding that physical attendance was required were premised on facts where the job required regular and predictable on-site attendance).

In *Abram v. Fulton County Government*, 598 F. App'x 672, 677 (11th Cir. 2015), the Eleventh Circuit, consistent with law stating that essential functions are determined on a case-by-

17

case basis, evaluated whether physical presence was required for the plaintiff's specific job. In *Abram*, the defendant submitted evidence that physical presence of the front desk was an essential function of the plaintiff's position (Administrative Coordinator I) and, therefore, the plaintiff's request to work from home was not a reasonable accommodation. *Id.* Although covering the front desk was not included in the written description of the job, the plaintiff's supervisor's testimony and the plaintiff's own evidence demonstrated that this was a duty frequently performed by her and that was an essential function. *Id.*

Here, a review of Morris-Huse's job responsibilities support GEICO's assertion that her physical presence was an essential function of her job. Jones, who supervised Morris-Huse in Lakeland, stated that a TCR I Supervisor would conduct team meetings, typically on a daily basis, which required physical presence. Jones Decl. ¶¶ 8, 10. Although remote access was provided to TCR I Supervisors, it did not allow them to monitor phone calls in real time, which was among their duties. *Id.* ¶ 9. In fact, Jones stated that phone calls could be monitored only via a specialized software program installed on computers in GEICO's offices. *Id.* ¶10. Jones also indicated that TCR I Supervisors were responsible for supervising and managing associates, and that physical presence was required to provide immediate feedback to associates or answer any questions that associates may have, and to supervise their team members' productivity and time management. *Id.* For example, TCR I Supervisors were responsible for ensuring those they supervised worked diligently, adhered to their schedules, and worked well with others. *Id.* In addition to the on-site requirements, Jones stated that the lack of a physical presence would negatively impact operations. *Id.* ¶ 11. Because associates relied on their TCR I Supervisor for immediate support, the physical absence of a supervisor would lower morale and detract from the team's ability to meet its goals. *Id.*

In short, Morris-Huse's job entailed supervision of other employees. GEICO's job description for her position listed performing duties at a work station, and meeting the attendance standard of the business location. Morris-Huse Depo. Ex. 9. Morris-Huse agreed during her deposition that these portions of the job description were accurate. *Id.* 56:8-20. Indeed, in her response to GEICO's motion for summary judgment, Morris-Huse stated that when a supervisor is temporarily out of the office for illness, vacation, or a project for longer than a few days "the work 'rolls to' another supervisor to review and approve." Doc. 38 p. 4. This implicitly indicates that certain work must be done by supervisors who are physically present in the office, and that an extended absence by her would cause work to be shifted to those supervisors in the office. Although Morris-Huse may have been able to perform her job duties from home on occasion, this does not support the conclusion that performing a majority of work via telecommuting, or even on an undefined as-needed basis, would allow Morris-Huse to perform the essential functions of her job. Instead, the undisputed evidence demonstrates that Morris-Huse held an interactive job, that used technology available only at the office locations, and which required her to have a regular, physical presence.

Based on the above, Morris-Huse has failed to establish a prima facie case of discrimination in violation of the ADA. Morris-Huse claims that she was discriminated against because she was not provided the accommodation of telecommuting. Nonetheless, the accommodations provided to Morris-Huse were reasonable, and allowed her to perform the essential functions of her job, whereas the requested accommodation would have prevented her from performing the essential

functions of her job[2]. Accordingly, as no genuine issues of material fact exist, GEICO is entitled to judgment in its favor as a matter of law on Morris-Huse's ADA discrimination claim.

Accordingly, it is **ORDERED AND ADJUDGED:**

1. Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 32) is **GRANTED.**

2. The Clerk is directed to enter judgment in favor of Defendant GEICO and against Plaintiff Susan Morris-Huse.

3. The Clerk is further directed to terminate the pending motions at docket entries 59 and 61 as moot and close this case.

**DONE AND ORDERED** in Tampa, Florida on January 30, 2018.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any

---

[2] Because this case may be decided based on GEICO's provision of reasonable accommodations, the Court need not address GEICO's arguments that Morris-Huse was not a qualified individual. Doc. 32 at 23-25.